WISCONSIN POWER & LIGHT COMPANY, Appellant, vs. PUB-
LIC SERVICE COMMISSION and another, Respondents.

*May 10—June 21, 1939.*

60

62

For the appellant there was a brief by *Schubring, Ryan, Petersen & Sutherland,* and oral argument by *William Ryan* and *Ralph E. Axley,* all of Madison.

For the respondents there was a brief by the *Attorney General, H. H. Persons,* and *H. T. Ferguson,* assistant attorneys general, and oral argument by *Mr. Ferguson, Mr. Earl H. Munson,* village attorney of Cambridge, and *Mr. Persons.*

MARTIN, J. We will approach the issues involved upon this appeal in the reverse order from which they are stated in the briefs of counsel. In logical sequence, the validity of the referendum election held on April 3, 1934, will be considered first because if the referendum is invalid there will be no occasion at this time to consider or decide the other issues.

The question submitted to the voters of Cambridge at the April 3, 1934, referendum was stated as follows:

"Shall the village of Cambridge acquire by purchase the electric plant and equipment actually used and useful for the convenience of the public now owned by the Wisconsin Power & Light Company?"

This question is in proper legal form. It is clear and unambiguous. It contains the only subject matter upon the referendum ballot. The only contention made by the appellant relates to the resolution passed by the village board set out in the foregoing statement of facts, which resolution was published in the same newspaper which printed the required

notice of the referendum election and immediately following the official notice. Appellant contends that the voters of the village of Cambridge were misled by the publication of the resolution, and that they voted believing they had the right to determine what property was "used and useful for the convenience of the public." Appellant argues that the resolution, in effect, modified the question submitted to the electorate, and that the electors in fact voted upon the question as modified by the resolution. It is true that the village board by its resolution described the property used and useful to be the distribution system in the village and the distribution system one-quarter mile north of the village and east of the village. However, the village board had no power or jurisdiction to determine what property was used and useful for the convenience of the public. That was a matter for the Public Service Commission to determine. There is no showing that any voter was in fact misled by the publication of the resolution, or that he would have voted differently had the resolution not been published. In order to sustain appellant's contention we would have to assume that the voters of the village of Cambridge were misled by the contents and publication of the resolution, notwithstanding the fact that the question printed upon the referendum ballot was in proper legal form, clear and unambiguous. In the absence of a showing to the contrary, we must assume that the voters understood the question upon which they voted either in the affirmative or negative. So far as this issue is concerned, we must hold the election valid.

Appellant next contends that the order of the Public Service Commission fixing just compensation is invalid because it fixed the value as of April 3, 1934, the date of the referendum election. It appears that the commission's order of September 10, 1935, did fix the value as of April 3, 1934; also in the order on rehearing, dated April 23, 1936, the commission fixed the value as of April 3, 1934; and again

in the order made after testimony taken in court had been transmitted to the commission, dated November 15, 1937, the value was taken as of April 3, 1934. The order of November 15, 1937, supersedes the prior orders, and, in addition to fixing the value of the property at the sum of $25,000, the order provided for an additional sum that might be determined later to be the value of the general equipment and supplies, and further modified the amount of just compensation by the addition or subtraction of such sum as might be similarly determined to be the value of the net additions to or net retirements from the property. In its complaint in this action, the plaintiff alleges that prices of materials similar to those included in the electric-utility property at Cambridge have appreciably advanced since the 1934 order was entered, and that the cost of labor entering into the reproduction cost new of said property has likewise increased since the 1934 order. These allegations are admitted in the answer of the Public Service Commission. Charts showing price trends of cedar poles, copper-wire base, transformers, meters, and labor were offered and received in evidence. The per cent of increase between September 1, 1934, and May 15, 1937, was 16.44 per cent, or an increase in the Public Service Commission appraisal of reproduction cost new as of September 1, 1934, from $29,954 to $34,878, due solely to increase in prices of labor and materials. Just compensation was not fixed by the commission as of the date of the award. This court, in the recent case of *Wisconsin P. & L. Co. v. Public Service Comm.* (second *Edgerton Case*) 231 Wis. 390, 284 N. W. 586, 286 N. W. 392, held that just compensation must be fixed as of the date of the commission's award. It will serve no useful purpose to further discuss this branch of the case. It is ruled by the decision in the second *Edgerton Case, supra.* We therefore hold in the instant case that the order fixing just compensation is invalid.

Appellant next contends that the order of the commission is unlawful for the reason that the order for which the award

is made does not include all of the electric-utility property actually used and useful for the convenience of the public, but includes a part only of such property. Its contention in this regard is because of the exclusion of the following items of property as being "used and useful:"

(1) The main feeder line;

(2) Voltage-regulator equipment; and

(3) Lines extending to the east from the village of Cambridge around Lake Ripley and north to London. Lake Ripley is a summer resort. London is a small unincorporated community located about three miles north from Cambridge. Normally, both communities would be given service from Cambridge. Cambridge is the trading place for both communities. The lines running out to Lake Ripley and to London are the same kind of lines that serve in the village of Cambridge; they are 6,900-volt lines; same kind of wire; same kind of poles; and same voltage as at Cambridge. The property described in the commission's order includes the property of the plaintiff company in the village of Cambridge except it excludes that portion of the three-phase 6,900-volt transmission line which is located within the village limits but extends beyond the village limits, also voltage-regulator equipment and lines referred to in No. (3) above. The line extends east near to Lake Ripley and north to the unincorporated village of London. Cambridge is served from a line that runs north from Edgerton to Albion, Rockdale, and Cambridge; it is a 6,900-volt line, and service is rendered directly to the people in Cambridge through transformers on poles carrying this line to the customers in Cambridge. There is no substation or step-down station in Cambridge. The commission's order includes as property used and useful, the poles which carry this 6,900-volt line, anchors, guys, crossarms, insulators, wires, transformers, meters, street-lighting equipment, but excludes the 6,900-volt line on these poles. It appears that the insulators, transformers, meters, street-lighting equipment, and services are all connected with

this 6,900-volt line. Clearly, it is property used and useful for the convenience of the public. It is this main feeder line that the village officials all through the proceedings have insisted on acquiring as being actually used and useful for the convenience of the public. Of course, their insistence would not be controlling upon the action of the commission. However, it does indicate to some extent that the feeder line, voltage-regulator equipment, and the line leading out to Lake Ripley and north to London, constituted a single unit. In the second *Edgerton Case, supra,* the order of the Public Service Commission included as "property used and useful" a transmission line from a substation located about one and one-half miles outside of the city of Edgerton to the city limits of Edgerton. See page 408. In *Wisconsin P. & L. Co. v. Public Service Comm.* (first *Edgerton Case*) 224 Wis. 286, 291, 292, 272 N. W. 50, dealing with the question of whether the rural lines extending out of Edgerton were used and useful, the court said:

"Are the rural lines extending outside the city used and useful for furnishing power within the city? It is to be remembered that these lines are physical extensions of lines originating at the city substation and serving the city. If these lines are cut at the city boundary, those rural customers now served will be left without power. As a business proposition, the ability to sell power to the rural customers may well be of some advantage in the operation of the city distribution plant. These lines are in that sense used and useful for furnishing power within the city. Furthermore, no voter, informed of the facts, would think of these rural lines as anything but a portion of the utility entity which is used and useful for furnishing power within the city. In other words, the question to the voter was, Shall the city acquire the power system which serves it? Such a question would necessarily include within the system integral parts which happened to serve others."

Further, the court said at page 291:

"We agree with plaintiff that the legislature unquestionably had in mind that if the municipality took over this elec-

trical plant,—'it should step in the shoes of the public utility owning the property and continue to furnish service not merely to the inhabitants within the city limits, but also to the people living near by but outside the city limits. If such were not the case, the acquisition by the city of only that part of the property which is located within the city, would deprive the people just outside the city of electrical service. . . . Undoubtedly, that is the reason why sec. 196.57 of the statutes contains the provision that the owner of the property consents to a future purchase of its property actually used and useful for the convenience of the public by the municipality in which the major part of it is situate.' "

The commission apparently excluded the feeder line within the village and the voltage-regulator equipment because the feeder line was used to serve other communities. In its order of April 23, 1936, the commission said:

"The essential fact, as we view it, which prevents any portion of this transmission line from being subject to acquisition by the village of Cambridge is the fact that it is used and useful by the Wisconsin Power & Light Company in the service of other communities and under other indeterminate permits than at Cambridge."

Sec. 196.57, Stats., provides:

"Any public utility accepting or operating under any license, permit or franchise granted after July 11, 1907, shall by acceptance of such indeterminate permit be deemed to have consented to a future purchase of its property actually used and useful for the convenience of the public by the municipality *in which the major part of it is situate* for the compensation and under the terms and conditions determined by the commission, and shall thereby be deemed to have waived the right of requiring the necessity of such taking to be established by the verdict of a jury, and to have waived all other remedies and rights relative to condemnation, except such rights and remedies as are provided in chapters 196 and 197."

This statute is clear. All of the plaintiff's property and equipment described in the commission's order—that is the property and equipment included and the property excluded

by the order—was all "actually used and useful for the convenience of the public." It is obvious that the main feeder line and voltage-regulator equipment located within the village of Cambridge are as much a part of the Cambridge utility unit as are the poles which carry the feeder line, the anchors, guys, crossarms, insulators, wires, transformers, meters, and street-lighting equipment, all actually used and useful for .the convenience of the public. There is no other utility in Cambridge or vicinity, and the Cambridge utility served the rural patrons in the vicinity of Lake Ripley and north to the unincorporated village of London and the vicinity of London. Under the decision of this court in *Wisconsin P. & L. Co. v. Public Service Comm. (Brooklyn Case)* 219 Wis. 104, 114, 261 N. W. 711, 262 N. W. 257, the commission is required to treat the local entity as the unit. The commission failed to do so in the instant case, and, under the decision of this court in the first *Edgerton Case, supra,* the municipality taking over the utility should step into the shoes of the public utility (plaintiff company) and continue to furnish service not merely to the inhabitants within the village limits of Cambridge, but also to people outside the village theretofore served by the Cambridge unit. Since the commission excluded from its order property actually used and useful for the convenience of the public, its order is not valid. Other questions are ably discussed in the briefs of counsel which we do not deem necessary to consider or discuss in view of the conclusions reached. The judgment must be reversed.

*By the Court.*—The judgment appealed from is reversed, and cause remanded with directions to the circuit court to enter judgment setting aside the order and for further proceedings according to law.